**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF MICHIGAN**

DENNIS KLEIN,

       Plaintiff,

v.

UNIVERSITY OF MICHIGAN BOARD OF REGENTS,

       Defendant,

UNIVERSITY OF MICHIGAN MEDICAL CENTER,

       Defendant,

Jim Harvey,

       Defendant, in his personal and professional capacities,

Bob Harris,

       Defendant, in his personal and professional capacities,

Bill O'Dell,

       Defendant in his personal and professional capacities,

Chris Schlaps

Case:2:17-cv-11192
Judge: Edmunds, Nancy G.
MJ: Grand, David R.
Filed: 04-17-2017 At 11:24 AM
CMP KLEIN v UNIVERSITY OF MICHIGAN
(sk)

Defendant, in his personal and professional capacities,

Maria Brussolo,

Defendant, in her personal and professional capacities,

Denise Seibert,

Defendant, in her personal and professional capacities,

Luis Mello,

Defendant in his personal and professional capacities,

Susan Quine,

Defendant, in her personal and professional capacities.

_____/

**CIVIL COMPLAINT**

Plaintiff Dennis Klein brings forth the following causes of action and alleges the following:

**PARTIES**

1.  Plaintiff Dennis Klein is an individual and a resident of Fenton, MI.

2

2. Defendant University of Michigan Board of Regents are the elected controlling body of the University of Michigan.

3. Defendant University of Michigan Medical Center is the wholly owned academic medical center of the University of Michigan Ann Arbor.

4. Jim Harvey is an individual and at the time of this complaint was an employee of the University of Michigan, in a capacity as electrical engineering manager/supervisor, direct report to Bob Harris

5. Bob Harris is an individual and at the time of this complaint was an employee of the University of Michigan, in a capacity as manager/director, Facility Planning and Development (FPD).

6. Bill O'Dell, is an individual and at the time of this complaint was an employee of the University of Michigan, in a capacity as electrical engineer.

7. Chris Schlaps is an individual and at the time of this complaint was an employee of the University of Michigan, in a capacity as interim manager/director, FPD

8. Maria Brussolo is an individual, and at the time of this complaint was an employee of the University of Michigan, in a capacity as outside dept. computer IT support

9. Denise Seibert is an individual and at the time of this complaint was an employee of the University of Michigan, in a capacity as finance invoice processing clerk, direct report to David Rose

10. Luis Mello, is an individual, and at the time of this complaint was an employee of the University of Michigan, in a capacity as FPD projects IT support

11. Susan Quine, is an individual, and at the time of this complaint was an employee of the University of Michigan, in a capacity as Susan Quine, Human Resources case worker

## JURISDICTION

Jurisdiction is invoked under Title 28 USC 1343, 1357, and 1367.

## VENUE

Venue is proper in the Eastern District of Michigan pursuant to Title 28 USC 1391.

## STATEMENT OF FACTS

1. Plaintiff was hired at University of Michigan Medical center on or about September 2008.

2. About October 2008, the harassment of Plaintiff by Harvey began when Harvey intensely questions Plaintiff about his attendance at meetings, and whether Plaintiff was working or not.

3. The questioning of Plaintiff was accusatory, belittling, and disparaging, without cause.

4. This began a continuous process by which Plaintiff was treated substantially differently than other employees, and subject to workplace harassment at the hands of Defendants either directly or in collusion with Harvey.

5. Harassment regarding Plaintiff's whereabouts began in October 2008 on a daily basis, and in July, 2009, during an employee review, Plaintiff asked Harvey, basically, "what his concern was" viz a viz Harvey's constant inquiry into Plaintiff's whereabouts.

6. Harvey responded that Harvey had a prior employee having issues with accounting for that employee's whereabouts; and that Harvey wanted to pre-empt any similar patterns in other employees.

7. Harvey stated that "I wanted to make sure to nip it in the bud if you have similar issues".

8. Plaintiff asserted to Harvey at that time that "I've worked on Campus for three years and have numerous years as a field engineer in industry and you're now attempting to call question to this, without cause or foundation?"

9. Harvey responded: "When I went by this other fella's office, he was rarely there. And this calls issues into question."

10. Plaintiff replied "He's [the prior Harvey-reporting-employee] now working on campus and he doesn't have a problem there. As long as the work gets done. Right?"

11. Harassment of Plaintiff continued daily, with Harvey accusing Plaintiff on not being where Plaintiff should be, without cause.

12. On or about December 2011 Harvey became openly hostile at work after Plaintiff asked Denise Siebert a seemingly simple question via short email asking "How does a vendor get paid?" Being relatively new to the department, Plaintiff didn't know the department's accounts payable pathway, in or out of office.

13. Siebert forwarded this email to the director's office, Harris.

14. Harris promptly called a meeting.

15. The meeting became a hostile-toned interrogation examination of the Plaintiff's email's intent, implying malfeasance, or dereliction on the part of Plaintiff, where none existed.

16. Harris made accusations and intimations of Plaintiff committing policy violations of authorizing work without a UM signed work agreement.

17. Harris' discussion was heated, emotional, over-the top, and by any standards unprofessional and belligerent, and created a hostile work environment.

18. On or around April 2012 Harris called a meeting regarding a continuing failing MRI unit at East Ann Arbor facility.

19. Rather than help seek engineering solutions, Harris blamed Plaintiff for conditions with the MRI unit that existed long before Plaintiff began employ.

20. On or around April 2012, while assisting the Maintenance Department at East Ann Arbor, Plaintiff discovered a defective circuit breaker on the MRI unit.

21.  After returning to the office from the site, Harvey questioned Plaintiff as to his whereabouts after Plaintiff discovered the circuit breaker

22. Plaintiff told Harvey he had come directly from the site, walked in from the parking lot to Harvey's office.

23. Plaintiff asked Harvey, "Is this not acceptable?"

24. His answer was, "We need to make sure Harris hears about it from us first before he hears it from the client."

25. Plaintiff ask, "How much more direct can I be?"

26. At no time were other employees being called to task on their whereabouts daily.

27. There was never any showing that Plaintiff was NOT at the workplace which he was supposed to be, at the times he was supposed to be.

28. On or around April 2013, Plaintiff's office computer was unreliable, needing updating due to outdated equipment.

29. Plaintiff submitted a trouble ticket to our in-house IT dept. for repairs.

30. Other employees have their computers fixed within 48 hours of a computer breakdown.

31. Plaintiff was treated differently in his computer breakdown experience, as described below.

32. Maria Brussolo showed up the next day as IT support to assess the computer situation.

33. Brussolo said she need to do an entire swap-out. But that Plaintiff would have to do a back-up of his computer first.

34. Plaintiff asked Brussolo for assistance or direction on how to do this.

35. Brussolo stated she would close the trouble ticket and will open a new ticket after Plaintiff had my computer backed up.

36. Other employees are routinely assisted in backing up their computers.

37. Plaintiff was not assisted in backing up his computer for repair.

38. Brussolo left Plaintiff's workspace.

39. Plaintiff was left with no operating computer.

40. Plaintiff then borrowed and signed out a department laptop located adjacent Harris' office in a file cabinet.

41. In the meantime Plaintiff had sought out Harvey to expedite support to no avail.

42. Harvey did nothing in support of Plaintiff's computer issue.

43. On or around May 2013, Brussolo stopped by seeing that Plaintiff was still on a laptop.

44. Brussolo accuses Plaintiff of being stubborn for not accomplishing a backup.

45. Plaintiff could not accomplish a backup without assistance.

46. Plaintiff asked if he may take the desktop computer to a local person, whom Plaintiff uses, to back it up for him.

47.  Brussolo absolutely refuses.

48. On or around June 2013, Louis Mello stops by Plaintiff's office.

49. Mello learns that Plaintiff has an inoperative computer.

50. Mello states that he can fix it, but does not.

51. Mello leaves chuckling.

52. Harvey puts pressure on Plaintiff to return the laptop.

53. Plaintiff asked for more time with the laptop.

54. Harvey agreed to more time.

55. The following day Plaintiff went out and bought two 16M memory sticks.

56. Plaintiff invited Harvey to his office to fix it himself.

57. Harvey failed/could not.

58. Plaintiff returned the FPD laptop.

59. Plaintiff had no functioning computer.

60. Plaintiff was still held to task to complete his work by computer.

61. Plaintiff brought his own from home.

62. On or about July 2013, Brussolo stops by inquiring on the non-company-issued laptop.

63. Plaintiff show her he brought in two USB sticks and told her that Harvey couldn't perform
the back-up, either. Plaintiff told her Mello also stopped by and laughed him off as she (Brussolo
) had been doing. Plaintiff continued, "If after all this, now going on 4 months without my
computer isn't convincing you that I need assistance, will going another 4 months without my
computer convince you?"

64. Brussolo appeared to agree to help. Plaintiff asked, "Just show me one back-up example,
and I'll do the rest."

65. Brussolo took five minutes to demonstrate.

66. Brussolo left Plaintiff's office.

67. Plaintiff immediately completed the remaining back-ups in fifteen minutes.

68. Plaintiff called Brussolo first thing the next day to open a ticket and Brussolo informed Plaintiff that they had given away the computer slated for Plaintiff elsewhere due to Plaintiff's delays on the back-up issue.

69. This incurred further delays on getting an available computer readied.

70. On or about July 2013 Plaintiff submitted a verbal request to Harvey for upgrade to a two-monitor computer configuration after Plaintiff sought out David Rose first.

71. Plaintiff remained the only electrical engineer under Harvey with a single monitor 17" computer station.

72. A 17"computer station is insufficient for CAD drawing work.

73. All Plaintiff's FPD colleagues have dual monitor 21" or better.

74. Plaintiff was being treated differently from other employees with respect to his work equipment.

75. Plaintiff had been assigned obsolete equipment since his first day at FPD.

76. Other employees were assigned new or modern equipment.

77. Harvey refused to help pursue my multiple computer update/upgrade requests to him.

78. Plaintiff is forced to use substandard equipment in struggling attempts of efficiently performing his work assignments.

79. That work environment and disparate treatment caused undue stress on Plaintiff.

80. On or about August 2013, Jim Harvey's negatively-toned employee evaluation of Plaintiff was accusational, confrontational, and inaccurate, causing Plaintiff great emotional distress, in its use of fear and intimidation.

81. Harvey stated during that review an issue with the alleged number of emails in Plaintiff's inbox, and how it was a problem to accept a meeting notice with Harvey noting it to be the day before.

82. To date, Harvey has failed to produce evidence or documentation supporting his false claim and reasons for his unsatisfactory evaluation based on my engineering performance.

83. Harvey been unable to demonstrate any dissatisfaction of the bi-weekly project update meetings to validate his engineering claims.

84. Harvey claims he reported his dissatisfaction to HR, and to Harris.

85. Harvey communicated to Plaintiff that HR suggested "we work it out between the two of us" and that Harris didn't want to be involved in any disciplinary capacity: to leave it between Harvey and Plaintiff as a private matter.

86. Harvey recommended that he and Plaintiff meet for the next year every other month as an "incremental performance improvement" program.

87.  Harvey provided no documentation or communications outlining specific improvement deficiencies or target goals of said performance improvement program.

88. Harvey left it to Plaintiff address his own "deficiencies", which Plaintiff guessed at.

89.  Plaintiff was under duress to accept Harvey's terms and forced to appease him by agreeing to this "program".

90. On or about Sept 2013, employee improvement kickoff meeting launch with Harvey,

91. At that meeting, upon Plaintiff presenting an "improvement list" to Harvey, Harvey became enraged and belligerent, slamming his fist on the table injuring himself. This was an act of workplace violence.

92. Harvey sought medical attention for his self-inflicted injury.

93. Harvey began wearing a hand brace.

94. Plaintiff possesses a photograph showing Harvey 's hand in a medical brace due to the incident.

95. UM has an articulated zero-tolerance policy for workplace violence.

96. On or about Sept 2013, during a meeting with Bob Harris regarding Arc Flash project performance issues, Harvey turned his anger and disruptive behavior towards me.

97.  It was at this meeting that Harris confronted me belligerently, stating that he perceived Plaintiff's method of executing the project to be inferior and substandard.

98. When Plaintiff explained he took his work direction from Harvey, he burst out "Don't blame Harvey on this!"

99. Plaintiff asked, "Well then who do I go to for direction if not Jim?"

100.  Harris shifted his demeanor from elevated hostile to openly aggressive, stating brusquely: "if Financial issues, go to David Rose. If for invoice, go to Seibert".

101.  After the meeting Plaintiff was so upset, stressed and shaken, Plaintiff was unable to return to work as Plaintiff had to take the remaining afternoon and next day off as sick days.

102. On or around Sept 2013, during the time Plaintiff took sick days Plaintiff contacted Human Resources Thursday and again on Monday to report his on-going, unrelenting disruptive conduct and workplace violence incident.

103. Susan Quine, HR, failed/refused to respond to either of Plaintiff's calls for help.

104.On Plaintiff's 2nd phone call Monday, the receptionist scolded Plaintiff for making the second follow up call and told Plaintiff not to be "bothersome" and not to call again by saying: "Don't be one of those employees who keeps calling. Susan (Quine) has received your message and she will return your call.".

105. On or around Sept 2013, under further stress, duress and apprehension Plaintiff made appointment with the UM Employee Assistance Program's PhD Brent Beam, licensed psychologist.

106. Dr. Beam enlightened Plaintiff to the typical abusive disruptive behaviors that run endemic at the University, that HR is generally prejudiced against employees and advocate prescriptively for managers.

107. Beam described Harvey's conduct and behaviors as being a classic micro-manager with all the characteristics that that entails.

13

108. Dr. Beam stated the futile news that within UM there is no internal remedy or action that Plaintiff can take to bring correction to Harvey or Harris. That the EAP department is without authority. The HR system has the authority and unfortunately is clearly an advocate for the management, not the employee. Beam stated he estimates the University to be comprised of about 85% managers that operate this way. Plaintiff expressed puzzlement at this high amount of dysfunction in comparison to industry (as opposed to academia) where Plaintiff had spent many years. Beam agreed, stating he came from industry as well and this was a surprise for him when he arrived here. That Beam receives most if not all complaints from employees about management and little if none from managers complaining about employees.

109. On Sept 12, 2013 Plaintiff received email from Harvey launching continued emotional distress and mental abuse stating Harvey is "not pleased". Harvey was utilizing his anger and disruptive conduct as a tool to control and squelch Plaintiff's productivity in retaliation for Plaintiff having sought out another manager for advice and counseling per Harris' instruction, that se.

110. On or around December 2013 Plaintiff receives a UM Making A Difference Award from an appreciative client on one of his many projects, presented a quarterly FPD meeting by Harris. Harvey is listed as my Supervisor. Harvey never offered congratulations.

111. On or around January 2014, behind a closed door in Harvey's office, with Harvey present, Bill O'Dell displayed inappropriate disruptive behavior with raised angry voice index finger pointing at Plaintiff regarding his disputing my presentation of a long-term chronic MRI power issue.

14

112. O'Dell stated he was "sick and tired hearing me talk about it".

113. This behavior qualifies as UM policy Yellow Card disciplinary action, but was not issued as such.

114. On or around June 2013, Plaintiff received another UM Making A Difference Award from an appreciative client on one of his many projects. Presented at a quarterly FPD meeting by Harris.

115. Harvey is listed as Plaintiff's Supervisor. Again, Harvey makes no mention of Plaintiff's award, as if it never happened.

116. On or around the December 2013 office Christmas party, Plaintiff overheard Tom McIntyre reflect on an event that Harris manufactured.

117. Plaintiff sought out McIntyre for his account of the event.

118. McIntyre stated that Harris was determined to terrorize McIntyre.

119. McIntyre's story to Plaintiff was as such: Harris fabricated the accusation that the Information Technology group reported to Harris that McIntyre had a history of visiting inappropriate websites on his work computer. According to the story, McIntyre was called up to the front office only to be greeted by the local police, handcuffed and walked out to the patrol car. Plaintiff remain unclear if this was an authorized Hospital event and if so, who was the authorizing authority? Plaintiff asked McIntyre how Harris got the police to play along? McIntyre said, "Bob knows a lot of people."

120. On or around Feb 2014, Plaintiff meet with Harvey at the periodic employee performance improvement meeting. Harvey tells Plaintiff that he has been discussing Plaintiff with Harris. Indicates Harris and Harvey working together to change Plaintiff. Harvey tells Plaintiff "...that's why Harris sent a warning shot across your bow in the previous year employee evaluation." Plaintiff respond that Plaintiff does not recall any such comment on the previous year evaluation. Plaintiff recalls it was a normal evaluation for me from FPD. Harris holds a CCW permit. Harris made this known casually.

121. On or around February 2014, rather than remain private (only between proper parties) and discrete about this whole matter Harvey placed on his Outlook calendar for all to see: "Dennis' performance improvement review".  This is a HIPPA/privacy violation: public humiliation. Plaintiff addressed this issue with Harvey. Without remorse or apologizing, Harvey corrected the verbiage. The damage was already done. Word was out that Plaintiff was now target of Harvey's punitive action.

122. On or about March 2014, Linda Richardson approached Plaintiff, stating she knew all about workplace harrasment that Harvey, Harris and Bill O'Dell are giving Plaintiff.

123.  Richardson shares her office space with O'Dell and hears all of O'Dell 's ranting and complaining and overhears that O'Dell has hated Plaintiff since Plaintiff 's arrival.

124. Richardson describes to Plaintiff that Bill O'Dell is the motivated instigator behind the bullying that Plaintiff is experiencing.

125.  Richardson states That Harvey has done this in the past with other employees such as with Ellen McKenzie.

126. Richardson detailed how O'Dell has Harvey's ear and gets Harvey to enforce this abusive conduct and calculated mode of operation.

127. Richardson states Plaintiff is Harvey and O'Dell's "new victim".  Plaintiff was both stressed by this news.

128. Richardson said they are threatened by Plaintiff's industry experience much like she herself experiences.

129. Richardson took a lot of heat in the FPD office for her own industrial experience.

130.  Because Richardson was working here before Harvey and Harris were, lends to her greater credibility and technical ability.

131. Richardson states that Harris was incompetent for his first few years when Harris began employ at UM.

132. Richardson states that on many occasions Richardson had to correct Harris professionally. Richardson offered that she could see that Plaintiff was correct with many of my disputed discussions with O'Dell and Harvey.

133. Plaintiff asked Richardson if she could help out at some time in the future and that we speak with Harvey to diffuse it all. Richardson agreed.

134. On or about April 17, 2014 10:30AM Plaintiff received an accusational, disruptive email from Schlaps.

135. During responding to the aforementioned email, Plaintiff incurs a stroke.  Plaintiff's left ring finger stayed on the "s" of the keyboard.  Plaintiff had to lift his hand to stop the keyboard

hold down repeat feature causing me to experience symptoms of what Plaintiff now know and didn't at the time, a stroke.

136. On or about April 17, 2014, 5pm. Plaintiff admits self to the emergency room at the UM hospital. Plaintiff went at the end of the workday rather than during the day to avoid Harvey's continued retaliation and harassment.

137. On or about July 2014, Harvey puts pressure on Plaintiff's medical caseworker for Plaintiff to answer work-related questions from his residence.

138. Despite his medical condition, and just having suffered a stroke, the caseworker pressures Plaintiff to perform this once.

139. Plaintiffs medical matter was handled inappropriately, in retribution.

140. Plaintiff instructed case worker to instruct Susan Quine to place his objection to his medical treatment in his HR file.

**COUNT I: Intentional Infliction of Emotional Distress**

(1) Plaintiff incorporates and restates each of the above paragraphs as if fully set forth herein.

(2) The elements of the tort of Intentional Infliction of Emotional Distress are: (1) the defendant's extreme and outrageous conduct, (2) the defendant's intent or recklessness, (3) causation, and (4) the severe emotional distress of the plaintiff.

(3) As a direct and proximate cause of defendants' unlawful acts and omissions, plaintiff has sustained injuries and damages to wit a stroke, and subsequent and consequent injuries and damages to be specified at trial.

## COUNT 2: Defamation

(1) Plaintiff incorporates and restates each of the above paragraphs as if fully set forth herein.

(2) The elements of the tort of defamation are: (1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged publication to a third party; (3) fault amounting at least to negligence on the part of the publisher; and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of actual harm caused by the publication.

(3) As a direct and proximate cause of defendants' unlawful acts and omissions, plaintiff has sustained injuries and damages to wit a stroke, and subsequent and consequent injuries and damages to be specified at trial.

## COUNT 3: Invasion of privacy

(1) Plaintiff incorporates and restates each of the above paragraphs as if fully set forth herein.

(2) The elements of the tort of invasion of privacy are: (1) Unreasonable intrusion upon the seclusion of others; or (2)  Appropriating another's name or likeness; or (3) Giving unreasonable publicity to another's private life; or (4) Using publicity that unreasonably places another in a false light before the public (Doe v. Mills, 536 N.W.2d 824 (Mich. App. 1995).

(3) As a direct and proximate cause of defendants' unlawful acts and omissions, plaintiff has sustained injuries and damages to wit a stroke, and subsequent and consequent injuries and damages to be specified at trial.

## COUNT 4: Negligent hiring and retention

(1) Plaintiff incorporates and restates each of the above paragraphs as if fully set forth herein.

(2) Elements: "To sustain [a claim for negligent hiring], a plaintiff must produce evidence 'of appropriate standard for hiring, retaining, or supervising' the relevant class of employee…, as well as evidence demonstrating that the employer knew or should have known of the employee's propensity to engage in the challenged conduct…. In addition, such claims are subject to the overarching principle that,

under Michigan law, an employer cannot be held liable for intentional torts committed by an employee outside the scope of his employment." Verran v. United States, 305 F. Supp. 2d 765, 771 (E.D. Mich. 2004).

(3)  As a direct and proximate cause of defendants' unlawful acts and omissions, plaintiff has sustained injuries and damages to wit a stroke, and subsequent and consequent injuries and damages to be specified at trial.

### COUNT 5: Failure to provide a safe workplace

(1) Plaintiff incorporates and restates each of the above paragraphs as if fully set forth herein.

(2) "an employer has a statutorily imposed duty to make the workplace safe for its employees" Ghrist v. Chrysler Corp., 451 Mich. 242, 250, 547 N.W.2d 272 (1996). "as a matter of common law, an employer has a duty to maintain a reasonably safe workplace." Villar, 134 Mich.App. at 120 n. 1, 350 N.W.2d 920.

(3) As a direct and proximate cause of defendants' unlawful acts and omissions, plaintiff has sustained injuries and damages to wit a stroke, and subsequent and consequent injuries and damages to be specified at trial.

### COUNT 6: Breach of the implied covenant of good faith and fair dealing

(1) Plaintiff incorporates and restates each of the above paragraphs as if fully set forth herein.

(2) The implied covenant of good faith and fair dealing is included in the Uniform Commercial Code (UCC), and was codified by the American Law Institute in Section 205 of the Restatement (Second) of Contracts; however, jurisdictions vary with respect to their view and interpretation of the same. Under Michigan law, as of July 1st, 2013, under MCL § 440.1201(2), under the UCC, good faith is defined as "honesty in fact and the observance of reasonable commercial standards of fair dealing."

(3) As a direct and proximate cause of defendants' unlawful acts and omissions, plaintiff has sustained injuries and damages to a stroke, and subsequent and consequent injuries and damages to be specified at trial.

## COUNT 7: Violation of Title 42 USC 1983 and 1985

(1) Plaintiff incorporates and restates each of the above paragraphs as if fully set forth herein.

(2) The elements of a Section 1983 case are "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" by a "person" acting "under color" of state law. The "laws" referred to include those statutes that confer individual rights on a

class of persons that include the plaintiff. Because the purpose of Section 1983 is to vindicate federal rights, a plaintiff suing under the statute is in most circumstances not required to exhaust state procedures or remedies which would be otherwise required prior to filing suit.

(3) A Section 1983 complaint filed in federal court must name a defendant who is not immune under the Eleventh Amendment and who is acting under color of state law, and must seek relief not barred by the Eleventh Amendment. If the plaintiff establishes a violation of a federal right, defendants may in certain circumstances avoid liability for damages by proving a qualified immunity.

(4) As a direct and proximate cause of defendants' unlawful acts and omissions, plaintiff has sustained injuries and damages to wit a stroke, and subsequent and consequent injuries and damages to be specified at trial.

## COUNT 8: Violation of HIPPA

(1) Plaintiff incorporates and restates each of the above paragraphs as if fully set forth herein.

(2) HIPPA as regulated at 45 C.F.R. Parts 160, 162, and 164, protect health information from disclosure.

(3) As a direct and proximate cause of defendants' unlawful acts and omissions, plaintiff has sustained injuries and damages to wit a stroke, and subsequent and consequent injuries and damages to be specified at trial.

## COUNT 9: Breach of Contract (Employee Agreement)

(1) Plaintiff incorporates and restates each of the above paragraphs as if fully set forth herein.

(2) The elements of a claim of Breach of Contract are: The elements of a breach of contract action are (1) the existence of a contract between the parties, (2) the terms of the contract require performance of a certain action by the defendant, (3) the defendant breached its obligation to perform, and (4) the plaintiff incurred damages as a result of the breach (Synthes Spine Co, LP v Calvert, 270 F Supp 2d 939, 942 (ED Mich, 2003)).

(3) As a direct and proximate cause of defendants' unlawful acts and omissions, plaintiff has sustained injuries and damages to wit a stroke, and subsequent and consequent injuries and damages to be specified at trial.

## COUNT 10: Loss of Consortium, Society, and Companionship

(1) Plaintiff incorporates and restates each of the above paragraphs as if fully set forth herein.

(2) Loss of Consortium, Society, and Companionships are a tort alleging deprivation of the benefits of a family relationship due to injuries caused by a tortfeasor.

(3) As a direct and proximate cause of defendants' unlawful acts and omissions, plaintiff has sustained injuries and damages to wit a stroke, and subsequent and consequent injuries and damages to be specified at trial.

**DAMAGES**

Wherefore Defendant seeks damages, fees, and costs as follows:

a.  Punitive damages in the amount of $4,000,000.00.

b.  Compensatory damages in the amount of $4,000,000.00.

c.  Actual damages in the amount to be determined at trial.

d.  Any other damages just, proper and allowed by law,

Signed,

/s Dennis Klein

JS 44 (Rev. 08/16) **CIVIL COVER SHEET**

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

*Judge: Edmunds, Nancy G.*
*MJ: Grand, David R.*
*Filed: 04-17-2017 at 11:24 AM*
*CMP KLEIN v UNIVERSITY OF MICHIGAN*
*(sk)*

## I. (a) PLAINTIFFS
Dennis Klein

**DEFENDANTS**
UNINERSITY OF MICHIGAN BOARD OF REGENTS, UNIVERSITY OF MICHIGAN MEDICAL CENTER, Jim Harvey, Bob Harris, Bill O'Dell, Chris Schlaps, Maria Brussolo, Denise Seibert, Luis Melo, Susan Quine

**(b)** County of Residence of First Listed Plaintiff    Genessee
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Washtenaw
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [x] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 2 U.S. Government Defendant
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [x] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [x] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY**    **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane    [ ] 365 Personal Injury - | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability    Product Liability | | | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel &    [ ] 367 Health Care/ Pharmaceutical | | **PROPERTY RIGHTS** | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment |    Slander    Personal Injury | | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 330 Federal Employers'    Product Liability | | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) |    Liability    [ ] 368 Asbestos Personal | | [ ] 840 Trademark | [ ] 460 Deportation |
| | [ ] 340 Marine    Injury Product | | | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 345 Marine Product    Liability    Liability | | **LABOR** | [ ] 480 Consumer Credit |
| [ ] 160 Stockholders' Suits |    **PERSONAL PROPERTY** | | [ ] 710 Fair Labor Standards Act | [ ] 490 Cable/Sat TV |
| [ ] 190 Other Contract | [ ] 350 Motor Vehicle    [ ] 370 Other Fraud | | [ ] 720 Labor/Management | [ ] 850 Securities/Commodities/ Exchange |
| [ ] 195 Contract Product Liability | [ ] 355 Motor Vehicle Product Liability    [ ] 371 Truth in Lending | | Relations | **SOCIAL SECURITY** |
| [ ] 196 Franchise | [ ] 360 Other Personal    [ ] 380 Other Personal | [ ] 740 Railway Labor Act | [ ] 861 HIA (1395ff) | [ ] 890 Other Statutory Actions |
| |    Injury    Property Damage | [ ] 751 Family and Medical Leave Act | [ ] 862 Black Lung (923) | [ ] 891 Agricultural Acts |
| | [ ] 362 Personal Injury -    [ ] 385 Property Damage | [ ] 790 Other Labor Litigation | [ ] 863 DIWC/DIWW (405(g)) | [ ] 893 Environmental Matters |
| |    Medical Malpractice    Product Liability | [ ] 791 Employee Retirement | [ ] 864 SSID Title XVI | [ ] 895 Freedom of Information Act |
| **REAL PROPERTY** | **CIVIL RIGHTS**    **PRISONER PETITIONS** | Income Security Act | [ ] 865 RSI (405(g)) | [ ] 896 Arbitration |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights    **Habeas Corpus:** | | | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 220 Foreclosure | [ ] 441 Voting    [ ] 463 Alien Detainee | | **FEDERAL TAX SUITS** | |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment    [ ] 510 Motions to Vacate Sentence | | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 950 Constitutionality of State Statutes |
| [ ] 240 Torts to Land | [ ] 443 Housing/ Accommodations    [ ] 530 General | | [ ] 871 IRS—Third Party 26 USC 7609 | |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - Employment    [ ] 535 Death Penalty | | | |
| [ ] 290 All Other Real Property |    **Other:** | **IMMIGRATION** | | |
| | [ ] 446 Amer. w/Disabilities - Other    [ ] 540 Mandamus & Other | [ ] 462 Naturalization Application | | |
| | [ ] 448 Education    [ ] 550 Civil Rights | [ ] 465 Other Immigration Actions | | |
| |    [ ] 555 Prison Condition | | | |
| |    [ ] 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Title 42 USC 1983
Brief description of cause:
Tort and Civil Right Action for personal injury

## VII. REQUESTED IN COMPLAINT:
[ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $ 8,000,000.00

CHECK YES only if demanded in complaint:
**JURY DEMAND:** [x] Yes   [ ] No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE      DOCKET NUMBER

DATE
April 16, 2017

SIGNATURE OF ATTORNEY OF RECORD
*Dennis Klein*

**FOR OFFICE USE ONLY**

RECEIPT #    AMOUNT    APPLYING IFP    JUDGE    MAG. JUDGE

## PURSUANT TO LOCAL RULE 83.11

1.　　　　Is this a case that has been previously dismissed?　　　　☐ Yes
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　■ No

　　If yes, give the following information:

　　Court: _____

　　Case No.: _____

　　Judge: _____


2.　　　　Other than stated above, are there any pending or previously
　　　　　discontinued or dismissed companion cases in this or any other　　☐ Yes
　　　　　court, including state court? (Companion cases are matters in which　　■ No
　　　　　it appears substantially similar evidence will be offered or the same
　　　　　or related parties are present and the cases arise out of the same
　　　　　transaction or occurrence.)

　　If yes, give the following information:

　　Court: _____

　　Case No.: _____

　　Judge: _____


Notes :



# New Lawsuit Check List

**Instructions: Put a check mark in the box next to each appropriate entry to be sure you have all the required documents.**

| | |
|---|---|
| ☒ | Two (2) completed **Civil Cover Sheets.** |

| | | |
|---|---|---|
| ☒ | Enter the number of defendants named in your lawsuit in the blank below, add 2 and then enter the total in the blank.<br><br>_10_ + 2 = _12_ **Complaints.**<br><sub>_# of Defendants_ _Total_</sub><br><br>Received by Clerk: _____ Addresses are complete: _____ | Case: 2:17-cv-11192<br>Judge: Edmunds, Nancy G.<br>MJ: Grand, David R.<br>Filed: 04-17-2017 At 11:24 AM<br>CMP KLEIN v UNIVERSITY OF MICHIGAN<br>(sk) |

| | |
|---|---|
| ☐ | If any of your defendants are **government agencies**:<br>Provide two (2) extra copies of the **complaint** for the U.S. Attorney and the Attorney General. |

| If Paying The Filing Fee: | If Asking That The Filing Fee Be Waived: |
|---|---|
| ☒ Current new civil action filing fee is attached.<br><br>Fees may be paid by check or money order made out to:<br><br>**Clerk, U.S. District Court**<br><br>Received by Clerk: SK Receipt #: FL001790 | ☐ Two (2) completed **Application to Proceed in District Court without Prepaying Fees or Costs** forms.<br><br><br>Received by Clerk: _____ |

## Select the Method of Service you will employ to notify your defendants:

| Service via Summons by Self | Service by U.S. Marshal<br>(Only available if fee is waived) | Service via Waiver of Summons<br>(U.S. Government cannot be a defendant) |
|---|---|---|
| ☐ Two (2) completed **summonses** for each defendant including each defendant's name and address.<br><br>NO<br><br><br>Received by Clerk: _____ | ☐ Two (2) completed **USM – 285 Forms** per defendant, if you are requesting the U.S. Marshal conduct service of your complaint.<br><br>☐ Two (2) completed **Request for Service by U.S. Marshal** form.<br><br>Received by Clerk: _____ | ☐ You need not submit any forms regarding the Waiver of Summons to the Clerk.<br><br>Once your case has been filed, or the Application to Proceed without Prepaying Fees and Costs has been granted, you will need:<br>• One (1) **Notice of a Lawsuit and Request to Waive Service of a Summons** form per defendant.<br>• Two (2) **Waiver of the Service of Summons** forms per defendant.<br><br>Send these forms along with your filed complaint and a self-addressed stamped envelope to each of your defendants. |

### Clerk's Office Use Only

Note any deficiencies here: Going to bring the Summons back in. Only had 3 copies of Complaint

Rev. 4/13